Filed 8/29/25  P. v. Machuca CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B333221 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA048904) |
| v. | |
| ROBBIN MACHUCA, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Juan Carlos Dominguez, Judge.  Affirmed.

Matthew Missakian, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Daniel C. Chang, Deputy Attorney General, for Plaintiff and Respondent.

Defendant and appellant Robbin Machuca (defendant) sought Penal Code section 1172.6 (former section 1170.95) resentencing for three first degree murders committed in 1991. The trial court held an evidentiary hearing and denied Penal Code section 1172.6 relief. Defendant waived her right to be present at the hearing in writing, but she now asks us to reverse because she believes that waiver was invalid—chiefly because she was not advised she could participate in the hearing remotely.

I

A

Defendant and three others participated in what defendant's appellate briefing fairly describes as a "horrible crime spree." Defendant, Vincent Hubbard (codefendant Hubbard), John Lewis (codefendant Lewis), and Eileen Huber (codefendant Huber) conspired to (and did) abduct three victims, rob them, and then fatally shoot them; codefendant Lewis confessed to being the actual killer of the three victims: Willie Sams, Elizabeth Nisbet, and Shirley Denogean. We summarize the offense conduct by drawing substantially on our Supreme Court's published opinion resolving co-defendant Lewis's appeal.[1] (*People v. Lewis* (2008) 43 Cal.4th 415.)

---

[1] Defendant and her accomplices were tried together. The trial court stated it reviewed the trial transcripts in connection with the Penal Code section 1172.6 resentencing proceedings and we have judicially noticed a 19-volume excerpt of those transcripts provided by the Attorney General.

"In July and August 1991, [codefendant Lewis] was living in apartment E of the Woodside Village Apartments in West Covina with codefendants Huber ([codefendant Lewis's] girlfriend), [defendant] ([codefendant Lewis's] half sister), and Hubbard ([defendant's] boyfriend)." (*People v. Lewis, supra,* 43 Cal.4th at 432.) At "[a]bout 9:30 p.m. on August 18, 1991, Willie Sams drove his car to . . . Security Pacific Bank . . . . From a gas station across the street, [codefendant Lewis] saw Sams drive up to the drive-through ATM . . . . [Codefendant Lewis] and codefendant Hubbard approached Sams's car and got in. Pointing [a] Ruger handgun at Sams, [codefendant Lewis] forced him to withdraw $200 from that ATM . . . and then to drive to another Security Pacific Bank and withdraw another $600.

"[Codefendant Lewis] drove Sams to Edgewood Middle School . . . . [Codefendant Lewis] and [codefendant] Hubbard forced Sams to get into the dumpster near the baseball field. [Codefendant Lewis] and [codefendant] Hubbard each fired several shots at Sams, killing him. [Codefendant Lewis] later removed the radio from Sams's car, attempted to wipe his fingerprints off the car, and abandoned the car in a shopping center parking lot.

"Shortly after 11:00 p.m., West Covina police officers found Sams's body. Several copper-jacketed bullets or bullet fragments were recovered from the dumpster.

"A couple of hours later, at 1:07 a.m., $60 was withdrawn from Sams's bank account using an ATM . . . .

"On August 19, 1991, . . . [codefendant] Hubbard and [defendant] attempted to use Sams's credit card to purchase about $700 worth of clothing from a store in El Monte. When the

attempted purchase was denied, [codefendant] Hubbard and [defendant] hurriedly left the store.

"Sams's car, minus its radio, was recovered two days later in the shopping center parking lot. Fingerprints on the car and on papers found in the car matched [codefendant Lewis's] prints. [Defendant's] prints were [also] found on papers in the car.

[¶] . . . [¶]

"Around 11:30 a.m. on August 24, 1991, Neil Nisbet and his wife Elizabeth drove their car to the Puente Hills Mall. Elizabeth was wearing or carrying several items of jewelry, including a gold ring with 17 diamonds, a gold bangle bracelet, and a gold rope chain bracelet. Elizabeth waited in the car while Neil entered the mall to run an errand. When Neil returned about 10 minutes later, the car and Elizabeth were gone. Neil searched for Elizabeth for several hours and then called the police.

"Meanwhile, [codefendant Lewis], . . . [defendant], and possibly one or more other codefendants arrived at the Puente Hills Mall in codefendant Huber's car, parked, and saw Elizabeth Nisbet in her car. [Codefendant Lewis] forced his way into the car and pointed his gun at Nisbet. One or more of the codefendants bound Nisbet's hands and feet with duct tape. [Codefendant Lewis] drove the Nisbets' car to the Covina branch of First Interstate Bank, where he and . . . [defendant] used Nisbet's ATM card to withdraw $400. [Codefendant Lewis] then drove to a convenience store in Covina, where an additional $100 was withdrawn from Nisbet's account through an ATM . . . . [Codefendant Lewis] then drove north on the 605 freeway, followed by codefendant Huber's car. After stopping along the side of the freeway, [codefendant Lewis] shot and killed Nisbet.

4

[Codefendant Lewis] or one of his codefendants removed Nisbet's jewelry, and they departed in [codefendant] Huber's car.

"About 3:10 p.m. that same day, California Highway Patrol officers found the Nisbets' car on the northbound 605 freeway. Elizabeth Nisbet's body was under a blanket on the rear floorboards. The body was not yet cold.

"Elizabeth Nisbet had a gunshot wound to her left temple, which caused her death, and there were several gunshot wounds to her left arm and hand. She had a large blunt force trauma injury between her eyes, lacerations on her cheeks and lips, blackened eyes, and bruises on her wrists and hands. Holes in the blanket covering her indicated shots were fired through the blanket. Fragments of duct tape were attached to her socks and to her right forearm, and a twisted ring of duct tape was found underneath her body at approximately waist level. Three bullets were recovered from various locations inside the car.

"Several fingerprints lifted from the Nisbets' car and from an ATM receipt found in the car matched [codefendant Lewis's] fingerprints. A forensic scientist from the Los Angeles County Sheriff's Department determined that the duct tape used to bind Elizabeth Nisbet's feet came from a roll of tape that was [later] recovered [by police] from a nightstand in the bedroom of apartment E in West Covina . . . .

[¶] . . . [¶]

"Between 12:15 p.m. and 1:00 p.m. on August 27, 1991, Shirley Denogean drove her Mercedes Benz car to the Puente Hills Mall. Meanwhile, [codefendant Lewis], codefendant Huber, and at least one other codefendant drove to the mall. . . . [Codefendant Lewis] saw Denogean arrive, enter the mall, and return about 20 minutes later. As she was getting into her car,

5

[codefendant Lewis] forced his way at gunpoint into the car. One or more of the codefendants tied Denogean's hands in front of her with . . . plastic ties. [Codefendant Lewis] drove Denogean to the First Interstate Bank's City of Industry branch, where $400 was withdrawn from Denogean's account. [Codefendant Lewis] then drove Denogean to another branch of the same bank, where [codefendant] Huber withdrew another $100 from Denogean's account. Several unsuccessful attempts to withdraw more money from Denogean's account were made at various ATM[s] . . . ."

"[Codefendant Lewis] drove Denogean's car west on the Pomona Freeway, stopping between the Rosemead and San Gabriel Boulevard exits. Codefendant Huber followed in her car. [Codefendant Lewis] forced Denogean at gunpoint to walk down an embankment, to an area surrounded by bushes. Once there, [codefendant Lewis] fired three shots at Denogean, killing her. [Codefendant Lewis] and his codefendants then drove away.

"About 12:04 a.m. the next day, $220 was withdrawn from Denogean's bank account through an ATM at a convenience store. Denogean's car was found in El Monte that same day. Fingerprints on the car and on papers found in the car matched [codefendant Lewis's] and . . . [defendant's] prints.

[¶] . . . [¶]

"Codefendant Huber was arrested [at] about 2:30 a.m. on August 30, 1991. At 3:15 a.m., [codefendant Lewis] and . . . [defendant] and [codefendant] Hubbard were arrested at apartment E in West Covina. [¶] . . . [¶] Several plastic ties of the kind used to bind murder victim Shirley Denogean's wrists were found in the dishwasher and in the hall closet. The roll of duct tape that had been used to bind murder victim Elizabeth Nisbet was found inside the nightstand in the bedroom.

6

[¶] . . . [¶]  The search also revealed several items of the victims' property, including Denogean's white purse, credit card, camera, and diamond engagement and wedding ring set, and the radio from murder victim Willie Sams's car.  At the time of her arrest, [defendant] was wearing several pieces of murder victim Elizabeth Nisbet's jewelry.  [¶]  After his arrest, [codefendant Lewis] made four statements to law enforcement officers in which he admitted killing . . . Sams, Nisbet, and Denogean." (*Lewis*, *supra*, 43 Cal.4th at 436-439.)

The trial jury convicted defendant of conspiracy to commit murder (and other crimes); the murders of Sams, Nisbet, and Denogean; and numerous other kidnapping and robbery charges. The jury found true robbery-murder (Pen. Code, § 190.2, subd. (a)(17)(A)), kidnapping-murder (Pen. Code, § 190.2, subd. (a)(17)(B)), and lying in wait (Pen. Code, § 190.2, subd. (a)(15)) special circumstance allegations attached to each of the murder counts.  The jury also found true a multiple murder (Pen. Code, § 190.2, subd. (a)(3)) special circumstance allegation.  The trial court sentenced defendant to life in prison without the possibility of parole for the murders.

B

Decades later, defendant filed a Penal Code section 1172.6 petition seeking resentencing on the murder convictions.  After initial proceedings in the trial court and this court on the resentencing petition,[2] the trial court set the matter for an

---

[2]    We reversed the trial court's initial summary denial of defendant's petition because the record did not establish she was ineligible for relief as a matter of law.  We cautioned, however, that there "appear[ed] to be considerable evidence that would

7

evidentiary hearing (what it called a "hearing on remittitur" in its minute order).

Before the hearing date, the trial court asked counsel for defendant whether he would be getting a waiver of his client's right to be present at the hearing.[3]  Counsel said he would submit a written waiver.  A short time later, the defense filed a written waiver of appearance with the court, prepared on defense counsel's letterhead, that was personally signed by defendant.

The waiver of appearance defendant submitted, which is dated June 19, 2023, includes a typed paragraph waiving the right to be present and an additional, longer handwritten note from defendant—which is important for purposes of this appeal. The typed paragraph states:  "I, Robbin Machuca, having been advised of my right to be present at my hearing on the Remitt[it]ur, do hereby waive my right to be present and request that my attorney, John Tyre, appear on my behalf.  I wish to

---

support a conclusion that defendant is a major participant who acted with the requisite reckless disregard—including defendant's knowledge of the violent tendencies of her co-defendants (at a minimum, as to two of the murders); defendant's presence at the scene of the crimes; and defendant's sharing in the spoils obtained from the murdered victims."  We accordingly explained that the court on remand was not precluded "from finding, beyond a reasonable doubt, that defendant was a major participant in the murders who acted with reckless indifference to human life—particularly if the record looks much the same at a [Penal Code] section [1172.6], subdivision (d)(3) hearing" as it did at the time of that prior appeal.

[3]  Defense counsel was the same attorney who represented defendant at her criminal trial.

8

remain at the State Prison facility in order to continue my classes and my rehabilitation. Thank you for this opportunity and I appreciate any consideration the Judge may be able to give me in this case[.]" Beneath that paragraph and defendant's signature, defendant handwrote the following (emphasis ours): "Please know that because of high risk medical, compromised immune system *I am very hesitant to risk infections that could potential be life threatening but, I will if Judge Dominguez request my appearance there are other options such as court tv* C.C.W.F can be contacted call to litigations co-ordinator schedule court appearance. (see bottom of page for contact info.) [¶] I very humbly request this and am very sorry for my past choices to live the immoral, selfish, criminal lifestyle. I have to say thank you for consideration on [SB] 1437, [SB] 775, [and Penal Code section] 1172.6. My past 30+ years were justifiable, today I live to give back to society and the victims, the community, the neighbors, paramedics, all police agencies and the Judges." Beneath this statement, defendant also handwrote the contact information she referenced: "ext: 5113 ask for Z. Myers (Court TV)."

## C

At the evidentiary hearing in August 2023, counsel for defendant stated on the record that he had a signed waiver of appearance for his client. The parties then confirmed there was no additional evidence to be presented beyond the trial transcripts and, without objection, the court said it was ready to rule based on the briefing the parties provided to the court in advance of the hearing.

The trial court ruled on the record as follows: "[W]ithout going into a lot of detail, because I think everyone knows what

the facts are of this case, I think clearly the Banks and Clark[ ] requirements are fully met here; that [defendant] was an active participant and she acted with tremendous and reckless indifference to human life. [¶] If I recall correctly, she and one of the co-defendants were at a store, utilizing the credit cards of one of the victims. And, again, paperwork was found belonging to her in one of the victim's car[s]. So there was a lot of connection— and she was I.D.'d, I believe, by the surviving witness as . . . being present. [¶] So, without further ado, the court finds beyond a reasonable doubt that [defendant] is guilty of first-degree murder under the felony murder theory rule and also conspiracy to commit murder. And this is a finding that's made by the court as an independent trier of fact. [¶] And the court does find that the prosecution has met their burden of establishing each and every element of the offenses beyond a reasonable doubt. Therefore, the [Penal Code section] 1172.6 petition is denied."

Defense counsel then asked to briefly respond to the court's ruling, which the court permitted. Counsel argued defendant was "there for the kidnappings" but there was no proof "she was present at the murders" and no evidence she was "actually involved in the killing of another person." The court disagreed and adhered to its ruling, explaining (among other things) that defendant made statements inconsistent with counsel's argument and it was "unimaginable" that defendant, who lived with her codefendants in the home where weapons and the spoils of the robberies were found, "did not know . . . that every time they did a robbery, it ended up in a murder."

## II

Defendant's opening brief acknowledges she "does not contend that the totality of evidence could not have led a reasonable trier of fact [to] find her guilty of murder under current law." In other words, there is no challenge to the sufficiency of the evidence supporting the trial court's ruling. The challenge is, instead, that defendant's constitutional and statutory rights to be present at the hearing were violated because the waiver of her appearance was defective and the violation is prejudicial because if she had been present she "might have had something to say" that would have affected the trial court's view of her participation in the crimes. For reasons we now detail, we hold there was no violation of defendant's right to be present at the Penal Code section 1172.6 evidentiary hearing.

The parties agree defendant had a statutory and a constitutional right to be present at the hearing. A defendant, however, may waive his or her constitutional right to be present at a critical stage of the proceedings (which we assume this hearing was), but the waiver must be knowing, voluntary, and intelligent. (See, e.g., *People v. Bloom* (2022) 12 Cal.5th 1008, 1060 ["a defendant may waive his or her federal constitutional right of presence, provided the waiver is voluntary, knowing, and intelligent"]; *People v. Quan* (2023) 96 Cal.App.5th 524, 534-535.) State law too permits a defendant to waive his or her right to be present in court. (Former Pen. Code, § 977, subd. (b) ["The accused shall be physically or remotely present at all other proceedings unless they waive their right to be physically or remotely present, with leave of court and with approval by defendant's counsel. . . . The waiver of a defendant's right to be

11

physically or remotely present may be in writing and filed with the court or, with the court's consent, may be entered personally by the defendant or by the defendant's counsel of record"].)  So the only question we are asked to decide is whether defendant's written waiver of appearance form sufficed to effectuate the waiver that the constitution and the Penal Code permits a defendant to make.

Defendant principally argues the written waiver was insufficient because she was not advised of, and did not waive, her participation in the hearing *remotely*.  She claims that a waiver of the right to appear at a hearing that does not expressly specify it applies to an appearance made in a remote capacity cannot be knowing or intelligent, and cannot be proper under former Penal Code section 977, subdivision (d)—which specifies written waivers of the right to be present shall be "substantially" in the form of the following advisement:  "'The undersigned defendant, having been advised of their right to be present at all stages of the proceedings, including, but not limited to, presentation of and arguments on questions of fact and law, and to be confronted by and cross-examine all witnesses, hereby knowingly, intelligently, and voluntarily waives the right to be physically or remotely present at the hearing of any motion or other proceeding in this cause.  The undersigned defendant hereby requests the court to proceed during every absence of the defendant that the court may permit pursuant to this waiver, and hereby agrees that their interest is represented at all times by the presence of their attorney the same as if the defendant were physically or remotely present in court, and further agrees that notice to their attorney that their physical or remote presence in court on a particular day at a particular time is required is notice

12

to the defendant of the requirement of their physical or remote appearance at that time and place.'"

Defendant's argument fails in light of the substance of her written waiver—especially the portion of the waiver she handwrote. The waiver of appearance defendant filed acknowledged she had been advised of her right to appear at the "hearing on the Remitt[it]ur" and waived that right and requested her attorney to appear on her behalf instead. This appears on its face to be an unqualified waiver of her appearance in whatever capacity.[4] Defendant's handwritten note clarifies her waiver extends to remote and in person appearances because it states she would appear remotely (only) if requested by the trial court ("I am very hesitant to risk infections that could potential[ly] be life threatening but, I will *if* Judge Dominguez request my appearance there are other options such as court tv" (emphasis added)). Because defendant acknowledges the possibility of appearing remotely but opts to exercise it only if requested by the court, her waiver is "substantially" in the form required by Penal Code section 977 and cannot be said to have

---

[4]     Insofar as defendant argues former Penal Code section 977 gives defendants a right to appear remotely even when a court hearing is held in person (i.e., to choose whether to attend the hearing in person or participate remotely), we doubt that is the correct understanding of the statute. But we need not resolve that issue to decide this appeal. We will assume for argument's sake that a defendant must validly waive the right to appear remotely even for in-person hearings.

13

been unknowing or unintelligent because she was unaware of the possibility of participating remotely.[5]

Defendant additionally argues her waiver was unknowing and unintelligent because the waiver of appearance form she signed referred to a "hearing on the Remitt[it]ur" that was a legal concept that she would not understand and that would prevent her from understanding the nature of the hearing. The argument fails for several reasons. First, the waiver form itself reveals a level of legal sophistication on defendant's part. Her own handwritten note, not the portion of the waiver typed by her lawyer, anticipatorily thanks the trial court for its "consideration on [SB] 1437, [SB] 775, [and Penal Code section] 1172.6."[6] That

---

[5] To be sure, the model advisement in former Penal Code section 977, subdivision (b)(4) makes reference to a defendant's right to be confronted by and cross-examine all witnesses, but the absence of a reference to this in the waiver of appearance executed by defendant is inconsequential. There were no witnesses for defendant to confront or cross-examine at the Penal Code section 1172.6 hearing (beyond the confrontation and cross-examination already reflected in the transcripts of defendant's criminal trial).

[6] In her appellate briefing, defendant focuses only on the appearance waiver's typewritten statement that she would "appreciate any consideration the Judge may be able to give me in this case" and believes this shows defendant thought the hearing was more akin to a sentencing proceeding rather than one at which evidence would be considered. Defendant ignores, however, her handwritten statement on the waiver that details the "consideration" defendant was expecting, namely, "consideration on [SB] 1437, [SB] 775, [and Penal Code section] 1172.6."

14

defendant had in mind and cited the correct legislation and statute governing the hearing belies any suggestion that she was too unsophisticated to understand the nature of the hearing from the "hearing on the Remitt[it]ur" description (which was the same language the trial court itself had used to describe the nature of the hearing).  Second, the waiver form makes clear that defendant had been "advised" of her right to be present, and practically and in context, this advisement obviously came from her lawyer (defendant had not been in court during the appearances leading up to the evidentiary hearing).  That defendant *personally* acknowledged having been advised by her lawyer in connection with making her waiver further undermines any assertion that the "Remitt[it]ur" description precluded her from knowingly waiving her right to appear at the hearing. (Compare *People v. Davis* (2005) 36 Cal.4th 510, 532 [waiver of presence at pre-trial hearing based merely on *counsel's*

---

Defendant also argues her statement that she would appear remotely if requested by the court reveals she had a "fundamental misunderstanding of what this hearing was all about" because "a judge might wish to hear from a defendant at a typical sentencing . . . where remorse, rehabilitation, future plans or the like could be important" but this hearing was instead "essentially a trial."  The argument is unpersuasive.  The most natural reading of defendant's handwritten notation is as an assertion she did not want to make an appearance at all (because of health concerns—which can arise not only from illness exposures on the way to court but also illness exposures from unnecessary movement within a jail facility), but if the court for some reason insisted on an appearance, she would request that the court permit a remote appearance.

15

*representation* that he discussed the hearing with his client and his client waived his right to appear was invalid].)


DISPOSITION

The order denying defendant's resentencing petition is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, J.

We concur:


HOFFSTADT, P. J.


MOOR, J.


16